## NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MARCH 4, 2021

_Gonzáles C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 4, 2021

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MATTHEW S. WOODS, an individual, | ) | No. 96132-8 |
| Appellant, | ) | |
| v. | ) | En Banc |
| SEATTLE'S UNION GOSPEL MISSION, a Washington nonprofit, | ) | |
| Respondent. | ) | Filed: March 4, 2021 |

MADSEN, J.—We begin with the proposition that the legislature is entitled to legislate. WASH. CONST. art. II, § 1. It is entitled to make distinctions and to carve out exceptions in its assessments of proper public policy, within the constraints of the state and federal constitutions. *See*, *e.g.*, WASH. CONST. art. I, § 12. One constraint on legislative power is that it may not treat differently persons who are similarly situated unless a rational basis exists to do so and that it may not give persons immunity or

No. 96132-8

privilege without a reasonable basis when a fundamental right is at stake. *Id*.; U.S. CONST. amend. XIV.

The issue in this case is whether the legislature extended a privilege or immunity to religious and other nonprofit, secular employers and whether, in providing the privilege or immunity, the legislature affected a fundamental right without a reasonable basis for doing so. Lawmakers enacted Washington's Law Against Discrimination (WLAD), ch. 49.60 RCW, to protect citizens from discrimination in employment, and exempts religious nonprofits from the definition of "employer." RCW 49.60.040(11). In enacting WLAD, the legislature created a *statutory* right for employees to be free from discrimination in the workplace while allowing employers to retain their *constitutional* right, as constrained by state and federal case law, to choose workers who reflect the employers' beliefs when hiring ministers. Consequently, we must balance under law these competing interests, and we look to both our state and federal constitutions for guidance—specifically article I, section 12; article I, section 11; the First Amendment; and, the United States Supreme Court decision in *Our Lady of Guadalupe School v. Morrissey-Berru*, ___ U.S. ___, 140 S. Ct. 2049, 207 L. Ed. 2d 870 (2020).

Here, Matthew Woods brought an employment discrimination action against Seattle's Union Gospel Mission (SUGM). At trial, SUGM successfully moved for summary judgment pursuant to RCW 49.60.040(11)'s religious employer exemption. Woods appealed to this court, contesting the constitutionality of the statute. SUGM now argues that RCW 49.60.040(11)'s exemption applies to its hiring decisions because its employees are expected to minister to their clients. Under *Our Lady of Guadalupe*, a

2

No. 96132-8

plaintiff's employment discrimination claim must yield in a few limited circumstances, including where the employee in question is a minister. Whether ministerial responsibilities and functions discussed in *Our Lady of Guadalupe* are present in Woods' case was not decided below.

For the following reasons, we hold that RCW 49.60.040(11) does not violate article I, section 12 on its face but may be constitutionally invalid as applied to Woods. Accordingly, we reverse and remand the case to the trial court to determine whether SUGM meets the ministerial exception.

BACKGROUND

SUGM is a nonprofit, evangelical Christian organization providing services to Seattle's unsheltered homeless population. In 1999, SUGM opened its legal aid clinic, Open Door Legal Services (ODLS), to address its guests' many legal issues and facilitate the SUGM's gospel rescue work.

Woods, a professed Christian, signed SUGM's statement of faith when he began volunteering at the ODLS clinic as a law student. Later, as a lawyer, Woods inquired about the ODLS staff attorney position that became available in October 2016, disclosing that he was in a same-sex relationship. SUGM informed Woods that it was contrary to biblical teaching for him to engage in a same-sex relationship. Woods challenged this interpretation and applied for the position. The ODLS director notified Woods there would be no change to its policy. SUGM did not hire Woods for the staff attorney position.

3

No. 96132-8

In November 2017, Woods filed a complaint against SUGM, alleging it had violated his right to be free from discriminatory employment under WLAD. Clerk's Papers (CP) at 1-7. Woods claimed that RCW 49.60.040(11)'s exemption is unconstitutional as applied to him because the staff attorney job duties were "wholly unrelated to [SUGM's] religious practices or activities." CP at 6. SUGM argued that the religious exemption to WLAD applied under RCW 49.60.040(11), which excludes religious and sectarian nonprofit organizations from the definition of "employer." SUGM successfully moved for summary judgment, and Woods sought direct review, which this court granted.

ANALYSIS

Standard of review

At issue is whether RCW 49.60.040(11) validly exempts SUGM from WLAD provisions under the facts of this case. This court reviews questions of statutory interpretation and constitutionality de novo. *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 789, 432 P.3d 805, *cert. denied*, 139 S. Ct. 2647 (2019). Our primary objective in interpreting a statute is to ascertain and give effect to the legislature's intent as manifested by the statute's language. *See In re Marriage of Schneider*, 173 Wn.2d 353, 363, 268 P.3d 215 (2011). This court also reviews summary judgment de novo. *Wash. Educ. Ass'n v. Dep't of Ret. Sys.*, 181 Wn.2d 233, 241, 332 P.3d 439 (2014).

WLAD

"WLAD is a regulatory law enacted under the legislature's police power to promote the health, peace, safety, and general welfare of the people of Washington."

4

No. 96132-8

*Ockletree v. Franciscan Health Sys.*, 179 Wn.2d 769, 773 n.2, 317 P.3d 1009 (2014)

(plurality opinion) (citing RCW 49.60.010). Enacted in 1949, WLAD was promulgated

with the "purpose of ending discrimination by employers 'on the basis of race, creed,

color, or national origin.'" *Id*. at 773 (quoting *Griffin v. Eller*, 130 Wn.2d 58, 63, 922

P.2d 788 (1996)). The legislature has expanded WLAD to bar discrimination on the basis

of age, sex, sexual orientation, and disability, and to incorporate a private right of action

for employees and persons who use public accommodations. *Id*. (citing RCW

49.60.040).

As originally enacted, WLAD exempted from the definition of "employer" "any

religious, charitable, educational, social or fraternal association or corporation, not

organized for private profit." LAWS OF 1949, ch. 183, § 3(b).[1] The legislature rewrote

WLAD's definition of "employer" in 1957 to include secular nonprofit organizations,

exempting only small employers and religious nonprofits. LAWS OF 1957, ch. 37, § 4.

That definition is currently found in RCW 49.60.040(11), which provides, "'Employer'

includes any person acting in the interest of an employer, directly or indirectly, who

employs eight or more persons, and does not include any religious or sectarian

organization not organized for private profit."

---

[1] WLAD was modeled on a New York measure entitled the "Law Against Discrimination,"
which was enacted in 1945. Frank P. Helsell, *The Law Against Discrimination in Employment*,
25 WASH. L. REV. & ST. B.J. 225, 225 (1950) (citing 1945 N.Y. Laws 457). The New York law,
as in WLAD, originally excluded religious nonprofit associations from the definition of
"employer." 1945 N.Y. Laws 458; *see also* Morroe Berger, *The New York State Law Against
Discrimination: Operation and Administration*, 35 CORNELL L.Q. 747, 750 (1949). The term
"employer" in the New York law was "strictly defined" to avoid constitutional inhibitions. *See*
Current Legislation, 19 ST. JOHN'S L. REV. 170, 171-72 (1945).

No. 96132-8

We are asked to review whether the religious employer exemption violates article I, section 12 of the Washington State Constitution.

Constitutionality of RCW 49.60.040(11)

We presume statutes are constitutional, and the party challenging constitutionality bears the burden of proving otherwise. *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 215, 143 P.3d 571 (2006), *overruled in part by Chong Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019). "'[A]n as-applied challenge to the constitutional validity of a statute is characterized by a party's allegation that application of the statute in the specific context of the party's actions or intended actions is unconstitutional.'" *City of Seattle v. Evans*, 184 Wn.2d 856, 862, 366 P.3d 906 (2015) (alteration in original) (internal quotation marks omitted) (quoting *State v. Hunley*, 175 Wn.2d 901, 916, 287 P.3d 584 (2012)). "'Holding a statute unconstitutional as-applied prohibits future application of the statute in a similar context, but the statute is not totally invalidated.'" *Id.* (internal quotation marks omitted) (quoting *Hunley*, 175 Wn.2d at 916). A facial challenge must be rejected unless there is "*no set of circumstances* in which the statute[, as currently written,] can constitutionally be applied." *In re Det. of Turay*, 139 Wn.2d 379, 417 n.27, 986 P.2d 790 (1999) (quoting *Ada v. Guam Soc'y of Obstetricians & Gynecologists*, 506 U.S. 1011, 1012, 113 S. Ct. 633, 121 L. Ed. 2d 564 (1992) (Scalia, J., dissenting)). When determining whether a law is facially invalid, courts must be careful not to exceed the facial requirements and speculate about hypothetical cases. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008).

No. 96132-8

Facial claims are generally disfavored. *State v. McCuistion*, 174 Wn.2d 369, 389, 275 P.3d 1092 (2012). They often rest on speculation and "'run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Id.*

We have previously considered and upheld WLAD's religious employer exemption from a facial constitutional challenge in *Ockletree*. In that case, an African-American security guard at a Catholic hospital was terminated after he suffered a stroke. He sued the hospital for, among other things, a violation of WLAD, asserting that his termination was the result of illegal discrimination on the basis of race and disability. *Ockletree*, 179 Wn.2d at 772. The hospital moved to dismiss Larry Ockletree's WLAD claim, arguing that the hospital was exempt as a nonprofit religious organization under RCW 49.60.040(11). This court issued three opinions in a 4-4-1 split. The lead opinion held that RCW 49.60.040(11) was not facially unconstitutional under article I, section 12's privileges and immunities clause. *Id.* at 788-89 (Johnson, J., lead opinion). The concurrence agreed that RCW 49.60.040(11) is not facially unconstitutional but said it would have held that the provision is unconstitutional *as applied* to Ockletree. *Id.* at 805 (Wiggins, J., concurring in part in dissent). Thus, five justices agreed that RCW 49.60.040(11)'s religious employer exemption is not facially invalid. *Id.* at 772 (Johnson, J., lead opinion), 805 (Wiggins, J., concurring in part in dissent).

7

No. 96132-8

Because Woods challenges the religious employer exemption under WLAD as it relates specifically to his case, he advances an as-applied challenge, and we review it as such.[2]

Article I, section 12

Article I, section 12 provides, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." The purpose of article I, section 12 is to limit the type of favoritism that ran rampant during Washington State's territorial period. *Ockletree*, 179 Wn.2d at 775 (citing ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 26-27 (G. Alan Tarr ed., 2002)).

Though Washington courts have, at times, analyzed article I, section 12 as equivalent to the federal equal protection clause, this court also recognized that the text and aims of the constitutional provisions differed. *Id*. at 775-76. Article I, section 12 was intended to prevent favoritism and special treatment to the few while disadvantaging others, and the Fourteenth Amendment was intended to prevent discrimination against disfavored individuals or groups. *Id*. at 776 (citing *State v. Smith*, 117 Wn.2d 263, 283,

---

[2] We do not opine on the effect of this decision on *every* prospective employee seeking work with any religious nonprofit such as universities, elementary schools, and houses of worship. *See Ockletree*, 179 Wn.2d at 777 (noting employers covered under RCW 49.60.040(11) include Catholic Community Services, Jewish Family Services, CRISTA Ministries, YMCA, YWCA, Salvation Army, and St. Vincent De Paul, as well as churches, synagogues, and mosques). Woods does not prove and we do not hold that no set of circumstances exist under which the religious employer exemption can be constitutionally applied.

814 P.2d 652 (1991) (Utter, J., concurring)). Due to these distinctions, our state's privileges and immunities clause can support an analysis independent of the Fourteenth Amendment. *Id*. at 776 (citing *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 83 P.3d 419 (2004)).

We apply a two-pronged test to determine the constitutionality of the religious employer exemption under our article I, section 12: (1) whether RCW 49.60.040(11) granted a privilege or immunity implicating a fundamental right and (2) if a privilege or immunity was granted, whether the distinction was based on reasonable grounds. *Schroeder v. Weighall*, 179 Wn.2d 566, 573, 316 P.3d 482 (2014).

Two of Woods' fundamental rights are present in the current case: the right to an individual's sexual orientation and the right to marry. *See Lawrence v. Texas*, 539 U.S. 558, 577-78, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003); *Bowers v. Hardwick*, 478 U.S. 186, 215-20, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986) (Stevens, J., dissenting), *overruled by Lawrence*, 539 U.S. 558; *Obergefell v. Hodges*, 576 U.S. 644, 663-65, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015). In *Lawrence*, the Supreme Court struck down criminal convictions of persons engaged in same-sex conduct, holding that a liberty interest exists in a person's private, intimate conduct. 539 U.S. at 577-78. In so holding, the Court observed that persons in same-sex relationships enjoy the same liberty as those in heterosexual relationships to make intimate and personal choices central to their personal dignity and autonomy. *Id*.; *see also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery

9

No. 96132-8

of human life."). *Lawrence* endorsed Justice Stevens' dissenting opinion in *Bowers*, explaining that this liberty extends to unmarried as well as married persons. *Lawrence*, 539 U.S. at 574, 577-78.

In *Obergefell*, the Supreme Court concluded the fundamental right to marry includes same-sex couples and is protected by due process and equal protection clauses of the Fourteenth Amendment. 576 U.S. at 672-74; *see also State v. Warren*, 165 Wn.2d 17, 34, 195 P.3d 940 (2008) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion); *Loving v. Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967) (stating that the right to marriage is fundamental)); *see also State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902) (identifying as a fundamental right of state citizenship the right "to enforce other *personal* rights" (emphasis added)); *Corfield v. Coryell*, 6 F. Cas. 546, 551-52 (C.C.E.D. Pa. 1823) (No. 3230) (listing the right "to pursue and obtain happiness and safety" as a fundamental right).

As *Lawrence*, *Obergefell*, and Justice Stevens' dissent in *Bowers* contemplate, individuals possess the fundamental rights to their sexual orientation and to marry whomever they choose. *See Lawrence*, 539 U.S. at 574, 577-78; *Obergefell*, 576 U.S. at 651-52 ("The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, *to define and express their identity*." (emphasis added)), 664 (identifying and protecting fundamental rights requires "courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect"); *Bowers*, 478 U.S. at 216 (Stevens, J., dissenting) ("[I]ndividual decisions by married persons, concerning the

10

No. 96132-8

intimacies of their physical relationship, even when not intended to produce offspring, are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons." (citation omitted)).[3]

Here, Woods informed SUGM that he was involved in a same-sex relationship and voiced a desire to someday marry a man. *E.g.*, CP at 135 (Woods' cover letter to SUGM stated he could see "marrying and starting a family with another man."); *see also* CP at 114 (Decl. of Matt Woods) (stating Woods informed SUGM "that [he] had a boyfriend, and that [he] could see marrying a man"). Though this case also implicates the fundamental right to marry whomever one chooses, it is not limited to this context. Also implicated is the concomitant fundamental right to sexual orientation. Woods has invoked these fundamental rights, satisfying the first prong of the article I, section 12 test. *Schroeder*, 179 Wn.2d at 573.

Turning to the second prong of that test, we hold that reasonable grounds exist for WLAD to distinguish religious and secular nonprofits. RCW 49.60.040(11) itself is evidence of reasonable grounds. Courts routinely rely on statutory language to ascertain and carry out legislative goals when construing statutory and constitutional provisions.

---

[3] The fundamental right to sexual orientation does not appear to stem from just the federal constitution but from our state constitution as well. *See* WASH. CONST. art. I, §§ 3, 7, 12; *see also State v. Jackson*, 150 Wn.2d 251, 259, 76 P.3d 217 (2003) ("It is now settled that article I, section 7 is more protective than the Fourth Amendment."); *State v. Bartholomew*, 101 Wn.2d 631, 639, 683 P.2d 1079 (1984) ("[W]e have repeatedly noted that the Supreme Court's interpretation of the Fourteenth Amendment does not control our interpretation of the state constitution's due process clause.").

11

No. 96132-8

*See, e.g., Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002); *Wash. Water Jet Workers Ass'n v. Yarbrough*, 151 Wn.2d 470, 477, 90 P.3d 42 (2004) (citing *Anderson v. Chapman*, 86 Wn.2d 189, 191, 543 P.2d 229 (1975)). Meaning is discerned from the language itself, the context and related provisions in relation to the subject of the legislation, the nature of the act, the general object to be accomplished, and the *consequences* that would result from construing a statute in a particular way. *Burns v. City of Seattle*, 161 Wn.2d 129, 146, 164 P.3d 475 (2007). We find no persuasive reason not to examine and rely on statutory language when engaging in the context of article I, section 12's reasonable grounds analysis.

RCW 49.60.040(11) was originally included in the 1949 enactment of WLAD. Even when lawmakers rewrote the definition of "employer" in 1957, the statute continued to exempt religious nonprofits. This exemption has remained, despite the expansion of WLAD's protections. *See* LAWS OF 1957, ch. 37, § 1 (adding prevention of discrimination in employment in places of public resort, accommodation, or amusement); LAWS OF 2006, ch. 4 (expanding WLAD's protection against discrimination based on sexual orientation). RCW 49.60.040(11)'s inclusion in the enacting legislation and its continued existence demonstrate that the legislature plainly intended to include the exemption in WLAD.

Our state's protection of religion also explains the religious employer exemption. RCW 49.60.040(11); WASH. CONST. art. I, § 11. *Ockletree* noted the critically important distinction between religious and secular nonprofits: religious organizations have the right to religious liberty. 179 Wn.2d at 783-84 (citing WASH. CONST. art. I, § 11). The

12

No. 96132-8

greater protection offered by article I, section 11 than that of the First Amendment is evidence for treating religious nonprofits differently. *Id.* at 784; *see also First Covenant Church v. City of Seattle*, 120 Wn.2d 203, 224, 840 P.2d 174 (1992) (noting article I, section 11 of Washington's constitution is "stronger than the federal constitution").

In addition, the United States Supreme Court has upheld the exemption for religious organizations from federal discrimination suits in order to avoid state interference with religious freedoms. *Ockletree*, 179 Wn.2d at 784 (discussing *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336, 107 S. Ct. 2862, 97 L. Ed. 2d 273 (1987)). As five justices agreed in *Ockletree*, article I, section 11 and avoidance of state interference with religion constitute real and substantial differences between religious and secular nonprofits, making it "reasonable for the legislature to treat them differently under WLAD." *Id*. at 783, 806 (Wiggins, J., concurring in part in dissent).

Though we also conclude reasonable grounds exist to RCW 49.60.040(11) as a matter of facial constitutionality, the exemption may still be unconstitutional as-applied to Woods. *See Ockletree*, 179 Wn.2d at 789 (Stephens, J., dissenting), 806 (Wiggins, J., concurring in part in dissent). Woods has identified fundamental rights of state citizenship: the right to one's sexual orientation as manifested as a decision to marry. The first requirement of our article I, section 12 analysis is therefore satisfied. *See Schroeder*, 179 Wn.2d at 573. To determine whether reasonable grounds exist to support a constitutional application of RCW 49.60.040(11)(a)'s exemption in this case, we look to the ministerial exception outlined by the United States Supreme Court.

13

No. 96132-8

Ministerial exception

Because WLAD contains no limitations on the scope of the exemption provided to religious organizations, we seek guidance from the First Amendment as to the appropriate parameters of the provision's application. The Supreme Court's recent decision in *Our Lady of Guadalupe*, 140 S. Ct. at 2055, is instructive based on SUGM's argument that all of its employees are expected to minister to their clients.

In *Our Lady of Guadalupe*, the Court reviewed and clarified the ministerial exception it previously outlined in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n*, 565 U.S. 171, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012). The *Hosanna-Tabor* Court addressed an employee's claims of wrongful termination under the Americans with Disabilities Act (ADA) of 1990 and state law.[4] The employer, a Lutheran church and school, moved for summary judgment arguing that the teacher's suit was barred by the First Amendment because the claims at issue concerned the employee relationship between a religious institution and one of its ministers. According to the employer, the employee teacher was a minister and was fired for a religious reason. *Id.* at 180.

The trial court granted summary judgment for the employer. It ruled that the facts surrounding the teacher's employment in a religious school with a sectarian mission

---

[4] The employee teacher exerted claims for unlawful retaliation under both the ADA, 104 Stat. 327, 42 U.S.C. §§ 12101-12213 (1990), and the Michigan Persons with Disabilities Civil Rights Act, MICH. COMP. LAWS § 37.1602(a). *See Hosanna-Tabor*, 565 U.S. at 179-80.

14

No. 96132-8

supported the employer's characterization of the teacher as a minister, and the court inquired no further into the teacher's claims of retaliation. *Id*. at 180-81.

The Sixth Circuit Court of Appeals vacated the ruling, directing the trial court to proceed to the merits of the teacher's retaliation claims. *Id*. at 181. The Supreme Court reversed and reinstated summary judgment for the employer, observing, "The First Amendment provides, in part, that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Id*. The Court acknowledged that while "there can be 'internal tension . . . between the Establishment Clause and the Free Exercise Clause,'" *id*. (alteration in original) (quoting *Tilton v. Richardson*, 403 U.S. 672, 677, 91 S. Ct. 2091, 29 L. Ed. 2d 790 (1971) (plurality opinion)), there was no such tension in the matter at hand. "Both Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." *Id*.

*Our Lady of Guadalupe* revisited the ministerial exception. In that case, two teachers at Catholic primary schools were terminated and sued their employers for discrimination. 140 S. Ct. at 2057-59. Both trial courts granted summary judgment for the school employers based on the *Hosanna-Tabor* exception. *Id*. at 2058. The Ninth Circuit reversed, noting that while the respective teachers had "'significant religious responsibilities,'" their duties alone were not dispositive under *Hosanna-Tabor*: they did not have the formal title of minister, had limited formal religious training, and did not hold themselves out to the public as religious leaders or ministers. *Id*.

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 96132-8

The Supreme Court disagreed with the Ninth Circuit, concluding the ministerial exception applied and foreclosed the teachers' employment claims. The Court observed that the First Amendment precludes the government from interfering with the right of religious entities to decide matters of "faith and doctrine." *Id.* at 2060. Similarly, religious institutions are insulated from government intrusion on matters of "church government," which includes religious entities' internal management decisions, such as the selection of individuals who play key roles. *Id.* The ministerial exception, based on this notion, protects the freedom of religious institutions to choose and remove ministers without government interference. *Id*. at 2060-61.

Whether a position falls within the ambit of the ministerial exception depends on a "variety of factors." *Id*. at 2063. Importantly, the Court clarified that the factors discussed in *Hosanna-Tabor* were not meant to be a "checklist." *Id.* at 2067. The "recognition of the significance of those factors . . . did not mean that they must be met— or even that they are necessarily important—in all other cases." *Id.* at 2063. For example, the title of minister is not itself dispositive, especially considering some religions do not use the title or are not even formally organized. *Id.* at 2063-64. Ultimately, what matters "is what an employee does." *Id*. at 2064.

As explained below, *Our Lady of Guadalupe* and *Hosanna-Tabor* should guide our analysis here. Woods cites *Hosanna-Tabor* as supporting his contention that an inquiry into the secular nature of the attorney work performed by SUGM staff attorneys is permissible. He correctly notes that the Supreme Court performed such an inquiry in *Hosanna-Tabor*, and more recently in *Our Lady of Guadalupe*, to conclude that the

16

No. 96132-8

ministerial exception applied and barred the discrimination claims of the complaining employee teachers. 565 U.S. at 190.

Both cases recognize that a plaintiff's employment discrimination claim must yield where the employee in question is a minister. The claimant teacher in *Hosanna-Tabor* was determined to be a minister, which turned in part on how the church and the teacher held herself out to the world as a minister of the church. The organization "issued [the teacher] a 'diploma of vocation' according her the title 'Minister of Religion, Commissioned.'" *Id*. at 191. The receipt of such title "reflected a significant degree of religious training followed by a formal process of commissioning." *Id*. The teacher had to complete eight college-level courses in subjects such as biblical interpretation and church doctrine, obtain the endorsement of her local church, and pass an oral examination by a faculty committee at a Lutheran college. *Id*. She was then commissioned as a minister only upon election by the congregation and such status could be rescinded only upon a supermajority vote of the congregation. *Id*. Further, she claimed a special housing allowance on her taxes available only to employees earning their compensation in the exercise of the ministry. *Id*. at 192.

As for the teacher's job duties, she was charged with nurturing the Christian development of the students at her Lutheran school. In addition to secular subjects, she taught religion classes four days a week, led her students in prayer three times a day, took her students to weekly chapel services, and conducted such services herself twice a year. She also led her fourth graders in daily morning devotionals. *Id*. In short, the teacher

17

No. 96132-8

"performed an important role in transmitting the Lutheran faith to the next generation." *Id*.

The Court made clear in *Our Lady of Guadalupe* that the above circumstances were important to consider, but not "essential" to qualifying as a minister. 140 S. Ct. at 2062-63. "What matters, at bottom, is what an employee does." *Id*. at 2064. To that end, the Court concluded the Catholic school teachers at issue performed vital religious duties: guiding the faith lives of their students, providing instruction on subjects that included religion, praying and attending religious services with students, and preparing students for other religious activities. *Id*. at 2064-65. In short, though the teachers did not carry the official title of "minister," their "core responsibilities as teachers of religion were essentially the same." *Id*. at 2066. The teachers therefore qualified for *Hosanna-Tabor*'s ministerial exemption. *Id*.

Recognizing the need for a careful balance between the religious freedoms of the sectarian organization and the rights of individuals to be free from discrimination in employment, the Supreme Court has fashioned the ministerial exception to the application of antidiscrimination laws in accord with the requirements of the First Amendment. *See id.* at 2060-66; *Hosanna-Tabor*, 565 U.S. at 188-196. Here, Woods seeks employment as a lawyer with SUGM. SUGM has rejected his application because it maintains that all employees' first duty is to minister. In order to balance Woods' fundamental rights with the religious protections guaranteed to SUGM, we hold that article I, section 12 is not offended if WLAD's exception for religious organizations is

18

No. 96132-8

applied concerning the claims of a "minister" as defined by *Our Lady of Guadalupe* and *Hosanna-Tabor*.

This approach balances the competing rights advanced by Woods and SUGM. On one hand, Woods' sexual orientation and his right to marry are within his fundamental rights of citizenship. *Obergefell*, 576 U.S. at 656-60, 663-65; *Lawrence*, 539 U.S. at 574, 577-78; *Warren*, 165 Wn.2d at 34. On the other hand, SUGM has the right to exercise its religious beliefs, and central to this freedom is the messenger of those beliefs. WASH. CONST. art. I, § 11; *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring) ("When it comes to the expression and inculcation of religious doctrine, there can be no doubt that the messenger matters."). The First Amendment "gives special solicitude to the rights of religious organizations." *Hosanna-Tabor*, 565 U.S. at 189. Article I, section 11 of the Washington State Constitution offers even more robust protections. *See First Covenant Church of Seattle*, 120 Wn.2d at 224 (noting article I, section 11 of Washington's constitution is "stronger than the federal constitution"). The ministerial exception, recognized by the United States Supreme Court, every circuit court, and 12 other state supreme courts,[5] provides a fair and useful approach for determining whether application of RCW 49.60.040(11) unconstitutionally infringes on Woods' fundamental right to his sexual orientation and right to marry.

---

[5] Douglas Laycock, Hosanna-Tabor *and the Ministerial Exception*, 35 HARV. J.L. & PUB. POL'Y 839, 846 (2012) (noting all 12 geographic circuits and 12 state supreme courts recognize the existence of the ministerial exception).

19

No. 96132-8

Whether ministerial responsibilities and functions equivalent to those discussed in *Our Lady of Guadalupe* and *Hosanna-Tabor* are present in Woods' case that would similarly render an employment discrimination claim under WLAD unavailable is an open factual question that the trial court did not decide. While some of the criteria noted in *Our Lady of Guadalupe* and *Hosanna-Tabor* are present here, other criteria are not. Justice Yu's concurring opinion is helpful in this regard. *See* concurrence at 3-6. Whether an employee qualifies as a "minister" is a legal question and the title a legal term. *Hosanna-Tabor*, 565 U.S. at 190. Woods acknowledges that all SUGM employees are expected to evangelize, but there is no evidence that staff attorneys had titles as ministers or training in religious matters comparable to *Hosanna-Tabor*'s teacher. And while staff attorneys are expected to share their faith with clients as opportunities arise, there is no evidence that they are expected to nurture their converts' development in the Christian faith similar to the job duties performed by the teachers in *Our Lady of Guadalupe* and *Hosanna-Tabor*. Further, neither SUGM nor ODLS is a church or religious entity principally responsible for the spiritual lives of its members. SUGM employees are expected to be active members of local churches; SUGM employment alone does not appear to be sufficient religious affiliation. Employees held to be ministers in *Our Lady of Guadalupe* and *Hosanna-Tabor* led faith groups and taught religious doctrine. The record indicates that these duties occur outside SUGM, in local churches for SUGM employees. Moreover, Woods sought employment with SUGM as a lawyer specifically, not as a religious minister or teacher, and there is no indication that religious training is necessary for the staff attorney position, unlike the teachers in

20

No. 96132-8

*Hosanna-Tabor*.[6]  *See* concurrence at 6 (citing *Hosanna-Tabor*, 565 U.S. at 191).  It is best left to the trial court to determine whether staff attorneys can qualify as ministers and, consequently, whether Woods' discrimination claim under WLAD must be barred.

## CONCLUSION

We conclude that RCW 49.60.040(11) does not facially violate article I, section 12 of our state constitution.  However, we recognize that the provision may still be unconstitutional as applied to Matthew Woods.  To properly balance the competing rights advanced by Woods and SUGM, we apply the federal ministerial exception test established in *Hosanna-Tabor* and clarified in *Our Lady of Guadalupe*.  A material question of fact remains concerning whether the SUGM staff attorneys qualify as ministers.  Accordingly, we reverse and remand to the trial court to answer this open factual question.

---

[6] Justice Yu's concurring opinion also reviews the ethical constraints specific to lawyers. Concurrence at 4-7 (discussing relevant Rules of Professional Conduct).  These considerations also serve to distinguish lawyers from ministers under *Hosanna-Tabor* and *Our Lady of Guadalupe*.

No. 96132-8

_____
Madsen, J.

WE CONCUR:

_____      _____
                                         Gordon McCloud, J.

_____      _____
          Johnson, J.                                 Yu, J.

_____
         Owens, J.

_____      _____
                                           Wiggins, J.P.T.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 96132-8

YU, J. (concurring) — I concur with the court's determination that the legislature's decision to exempt religious employers from the right to be free from discrimination is subject to a careful balance of rights under our state constitution, the First Amendment to the United States Constitution, and United States Supreme Court decisions. I am cognizant of the evolving legal landscape at the national level and agree that a limited "as applied" approach is an appropriate exercise of judicial restraint and a prudent way to resolve this case.

Our court's decision today is not a carte blanche license to discriminate against members of the LGBTQ+ community who are employed by religious institutions. Rather it recognizes the statutory prohibitions against discrimination while also recognizing a limited and narrow ministerial exception required to alleviate a substantial and concrete burden on the free exercise of religious freedom. As noted by the majority and the dissent (Justice Stephens dissenting in

*Woods v. Seattle's Union Gospel Mission*, No. 96132-8
(Yu, J., concurring)

part and concurring in part), we utilize a two pronged analysis to determine whether a statutory provision violates article I, section 12 of the Washington Constitution. We ask: Does the statute grant a privilege or immunity and if so, are there reasonable grounds for such privilege or immunity? (*see* majority at 9; dissent in part at 11). I would hold that there are no reasonable grounds to afford the privilege of the WLAD exemption to SUGM because SUGM cannot enjoy a free exercise right to discriminate against an employee who performs nonreligious duties, such as a staff attorney. However, because there are factual questions regarding the duties of the staff attorney, I ultimately concur in the court's decision to remand.

Our state law protects the right to employment free from discrimination on the basis of LGBTQ+ status (as well as on the basis of race, gender, etc.). The law also protects the right of religious institutions to choose their ministers. Thus, I agree with the majority that a religious institution, such as a church, has the freedom to discriminate on the basis of LGBTQ+ status when choosing its ministers in accordance with its religious doctrines. I also agree with the majority that this license to discriminate belongs only to religious institutions and not to other entities such as legal, medical, or commercial institutions. It is also important to point out that this license to discriminate exists only with respect to

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the institution's choice of ministers (not with respect to its choice of nonministers) and that this freedom to discriminate is not a mandate to do so.

Given our state's long-standing commitment to eradicating discrimination and to fostering a diverse workforce, it is my greatest hope that religious institutions will recognize and embrace the choice to limit the "ministerial exception" to those employees for whom such an exception is absolutely necessary and grounded in sound reason and purpose. After all, the right to exclude the LGBTQ+ community from ministerial employment by religious institutions is not a right that must be exercised. Rather, it is a choice by that religious institution and it is a choice that is not governed by an external judicial doctrine but rather one carved out by the religious entity itself. Religious institutions making such a choice should be forewarned that today's decision bars redefining every aspect of work life as "ministerial." This court, like the United States Supreme Court, will insist that trial courts carefully evaluate claims that a particular employee who is not a traditional minister should nevertheless be reclassified, in hindsight, as a minister. In the case of lawyers licensed by the state, subject to the Rules of Professional Conduct, and obligated to let the client define the goal of the representation, such a claim will likely be difficult to prove.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Because this case is remanded for further proceedings, I write to offer guidance on the application of the "ministerial exception" as outlined in *Hosanna-Tabor Evangelical Lutheran Church & School v. Equal Employment Opportunity Commission*, 565 U.S. 171, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012), and further developed in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, ___ U.S. ___, 140 S. Ct. 2049, 207 L. Ed. 2d 870 (2020).

The task of reviewing whether any specific job falls within the ministerial exception remains an important judicial function; a charge that will require scrutiny of the actual job functions and the religious institution's explanation of the role. *See Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2066. The United States Supreme Court "called on courts to take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the exception." *Id.* at 2067 (citing *Hosanna-Tabor*, 565 U.S. at 190). And the fundamental purpose of the exception is to respect matters of faith and doctrine, or ecclesiastical governance, so that we do not meddle or undermine the independence of religious institutions.

The ministerial exception, required by both religion clauses of the First Amendment, is a guide that will help courts "stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Id.* at 2060. Whether a particular employment position

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

qualifies as "ministerial" is a question of law, and in this context, "minister" is a legal term, rather than a religious one, because the ministerial exception prohibits "government interference with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. A person does not have to be "the head of a religious congregation" to qualify for the ministerial exception, but there is no "rigid formula" for determining when the exception applies. *Id.* Instead, we must consider "all the circumstances" of the employment position at issue. *Id.*

Here, some of the circumstances weigh in favor of finding the ministerial exception applies. Seattle's Union Gospel Mission (SUGM) describes Open Door Legal Services (ODLS) as a "ministry" that operates with an "evangelical purpose," and ODLS staff attorneys "show the love of God by loving the client holistically, not just attending to legal needs." Clerk's Papers (CP) at 371-73. However, as SUGM has acknowledged, there is "a difference between being engaged in the ministry of a church and being a minister" for purposes of the ministerial exception. Wash. Supreme Court oral argument, *Woods v. Seattle's Union Gospel Mission*, No. 96132-8 (Oct. 10, 2019), at 28 min., 21 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

5

*Woods v. Seattle's Union Gospel Mission*, No. 96132-8
(Yu, J., concurring)

On the other hand, most of the circumstances of an ODLS staff attorney weigh against finding that such a position qualifies for the ministerial exception. Unlike the employer in *Hosanna-Tabor*, SUGM does not hold a staff attorney "out as a minister, with a role distinct from that of most of its members." 565 U.S. at 191. To the contrary, to the extent ODLS staff attorneys are tasked with furthering SUGM's religious mission, the same is true of "every Mission employee." CP at 64; *see also id.* at 699. Also unlike the employment position in *Hosanna-Tabor*, the ODLS staff attorney position does not require "a significant degree of religious training followed by a formal process of commissioning" as a minister. *Hosanna-Tabor*, 565 U.S. at 191. There is also no evidence that any ODLS staff attorney has held themselves out as a minister by claiming "a special housing allowance on [their] taxes that [is] available only to employees earning their compensation 'in the exercise of the ministry,'" or that staff attorneys were ever expected or required to do so. *Id.* at 192 (internal quotation marks omitted).

As noted by the majority, the Supreme Court has further clarified the inquiry by cautioning against the use of titles as an exclusive test since "what matters, at bottom, is what an employee does." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064. And unlike the teachers at issue in *Hosanna-Tabor* and *Our Lady of Guadalupe School*, the ODLS staff attorneys practice law first and foremost. They practice law in a context "primarily serving the homeless and others in great need."

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

CP at 64. It is this court that has final authority over the practice of law and legal ethics in Washington, and attorneys are required to comply with the Washington Rules of Professional Conduct (RPCs). There is no dispute that ODLS staff attorneys are required to comply with the RPCs. And in the context of a nonprofit legal aid organization serving the civil legal needs of vulnerable populations, I believe it is simply not possible to simultaneously act as both an attorney and a minister while complying with the RPCs.

Without question, the RPCs do *not* prohibit religious considerations from being a factor in legal practice because "[i]n rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation." RPC 2.1. However, in Washington, a lawyer must be guided by the client's interests, not the lawyer's (or their employer's) interests because the client has "the ultimate authority to determine the purposes to be served by legal representation." RPC 1.2 cmt. 1. Thus, "[c]oncurrent conflicts of interest can arise from . . . the lawyer's own interests." RPC 1.7 cmt. 1.

In the particular context of a legal aid organization serving the needs of vulnerable populations, the likelihood of concurrent conflicts of interest would be enormous if an attorney attempted to act as a minister and a lawyer at the same time. This conflict is likely if the necessary legal advice conflicts with the

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

religious message of the lawyer. SUGM provides legal counsel to clients regardless of clients' own religious views, creating a high risk of conflict between SUGM's religious mission and the client's goals for representation. And because SUGM is providing desperately needed civil legal aid to vulnerable populations, the likelihood that a client would feel coerced into acquiescing to SUGM's religious purposes would be very high if an ODLS staff attorney attempted to simultaneously play the dual roles of lawyer and minister. To provide just one example, if a same-sex couple had the goal of facilitating an adoption, a lawyer would be required to provide the clients with legal advice for achieving their goal, while a minister promoting SUGM's religious beliefs may be required to discourage the clients from pursuing such an adoption. When ODLS staff attorneys are faced with such situations, they properly respond as lawyers, not as ministers, because, as the ODLS director confirmed, "[o]ur legal advice is our legal advice." CP at 149-50.

Thus, in the particular context presented here, if SUGM raises the ministerial exception as an affirmative defense on remand, the facts asserted in this record strongly support a conclusion that an ODLS staff attorney cannot qualify for the ministerial exception as a matter of law. Unlike the educators in *Our Lady of Guadalupe School,* these staff attorneys are not charged with the responsibility of elucidating or teaching the tenets of the faith. They are first and foremost charged

8

*Woods v. Seattle's Union Gospel Mission*, No. 96132-8
(Yu, J., concurring)

with providing objective legal advice that may, in fact, conflict with the employing

entity's religious doctrine.  A religious organization that chooses to employ an

attorney in order to provide civil legal aid cannot control the legal advice by

requiring the attorney to serve as minister and attorney at the same time.

I concur.

_____
Yu, J.

_____
González, C.J.

9

*Woods v. Seattle's Union Gospel Mission*
(Stephens, J., dissenting in part and concurring in part)

No. 96132-8

STEPHENS, J. (dissenting in part and concurring in part)—Matthew Woods applied for an attorney position at Open Door Legal Services (ODLS), a legal aid clinic of Seattle's Union Gospel Mission (SUGM). Though Woods had volunteered at the clinic for about three years starting in law school, SUGM rejected his employment application because Woods is bisexual. As a condition of employment, SUGM requires employees to obey a biblical moral code that excludes "'homosexual behavior.'" Clerk's Papers (CP) at 4 (quoting SUGM's Employee Code of Conduct). Woods sued, alleging SUGM violated Washington's Law Against Discrimination (WLAD), ch. 49.60 RCW. The superior court granted SUGM's motion for summary judgment and dismissed Woods's suit based on RCW

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

49.60.040(11). That statute categorically exempts "any religious or sectarian organization not organized for private profit" from WLAD's definition of "employer." RCW 49.60.040 (11). In other words, the court ruled that WLAD grants religious nonprofits a statutory privilege or immunity from WLAD liability for employment discrimination. We granted review to determine whether this statutory exemption is unconstitutional.

In my view, we should hold RCW 49.60.040(11) violates our state constitutional privileges and immunities clause because it favors religious nonprofits over all other employers without reasonable grounds for doing so. While both the state and federal constitutions afford protections for religious freedom, those protections extend to employers only in the narrow context of ministerial employment and do not provide reasonable grounds for the categorical exemption from WLAD liability.[1]

---

[1] As explained below, whether the ministerial exception applies to the facts here is not before us on review but may be considered on remand. *See generally Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n.*, 565 U.S. 171, 188, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012) (holding that the First Amendment to the United States Constitution's religion clauses contain a ministerial exception that prevents government from interfering with a religious group's employment practices related to ministerial or ecclesiastical offices); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, ___ U.S. ___, 140 S. Ct. 2049, 2069, 207 L. Ed. 2d 870 (2020) (determining the First Amendment's ministerial exception precluded two parochial school teachers from suing for alleged employment discrimination).

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

On this basis, I dissent from the majority's holding under article I, section 12 of the Washington State Constitution, though I concur in the result to reverse the superior court's order granting summary judgment. I would hold the religious nonprofit exemption under RCW 49.60.040(11) violates article I, section 12's antifavoritism principles, and remand for further proceedings to give SUGM the chance to brief and argue its *affirmative defense* to WLAD liability based on the ministerial exception.

FACTS

SUGM incorporated in 1939 for the purpose of "preaching . . . the gospel of Jesus Christ by conducting rescue mission work in the City of Seattle." CP at 72. Its mission "is to serve, rescue and transform those in greatest need through the grace of Jesus Christ." *Id.* at 118. Its articles of incorporation provide, "[A]ny phase of the work other than direct evangelism shall be kept entirely subordinate and only taken on so far as seems necessary or helpful to the spiritual work." *Id.* at 72. In November 1943, the Internal Revenue Service (IRS) recognized SUGM as exempt from federal income tax under 26 U.S.C. § 501(c)(3). The IRS classified SUGM under 26 U.S.C. §§ 509(a)(1) and 170(b)(1)(A)(i) as a publicly supported church or a convention or association of churches. In other words, SUGM is a religious nonprofit organization.

-3-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Woods is Christian.  After entering law school, he decided to volunteer with SUGM's legal clinic, ODLS.  As part of his volunteer service, Woods willingly signed SUGM's statement of faith, which requires, among other things, agreement that the Bible is the infallible word of God.  SUGM belongs to the Association of Gospel Rescue Missions, a group of roughly 300 evangelical Christian ministries.  All member associations must comply with a similar evangelical Christian statement of faith for their volunteers and employees.  The statement of faith Woods signed did not mention sexual orientation.

As a volunteer, Woods helped ODLS clients resolve various legal issues involving divorce, child support, and immigration issues, and he represented his clients at administrative hearings.  Woods found satisfaction in his volunteer work, which aligned with his faith.  He hoped to someday obtain paid, full-time employment with SUGM.  In 2014, shortly after Woods was admitted to practice law in Washington State, a staff attorney position with ODLS opened, and Woods received an e-mail encouraging him and other volunteers to apply.  ODLS employs a managing attorney, two staff attorneys, and an administrative assistant/interpreter.  The job description listed several essential job duties and required knowledge, skills, and abilities, many of which had religious aspects.  The application also required answers to several questions about the applicant's religious beliefs.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Woods is bisexual. Unsure whether SUGM would accept his sexual orientation, he reached out to a friend and colleague at ODLS whom he had known since they were undergraduates together. He asked her if she thought his sexual orientation might pose a problem. At first, she did not think so, but she later found a policy in SUGM's employee handbook that gave her pause. The handbook stated, "'All staff members are required to sign the doctrinal standard of Seattle's Union Gospel Mission. All staff members are expected to live by a Biblical moral code that excludes . . . homosexual behavior.'" CP at 4 (alteration in original) (quoting SUGM's Employee Code of Conduct). She suggested that Woods ask the ODLS director, David Mace, for more information.

Woods e-mailed Mace and disclosed his bisexuality. He informed Mace that he had a boyfriend and that he could see himself marrying a man someday. He asked if that would impact his chances of employment. Mace told him that he could not apply given SUGM's code of conduct and confirmed the employee handbook prohibited "homosexual behavior."[2] *Id.* at 226. Woods applied anyway and, in his

---

[2] SUGM's chief program officer stated, "[T]he Mission's sincerely held religious belief is that the Bible calls Christians to abstain from any sexual activity outside of heterosexual marriage, including abstaining from homosexual behavior. This belief is based, in part, on passages such as Romans 1:26-27, 1 Corinthians 6:9, and Matthew 19:4. The Mission further believes that a Mission employee who publicly rejects this teaching undermines the Mission's ability to carry out its religious purpose. For example, because Mission employees model this surrender for our clients, we believe it is very difficult for

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

cover letter, he asked SUGM to reconsider its policy.  SUGM refused to consider him for employment.

Woods sued under WLAD, alleging SUGM engaged in discriminatory employment practices by refusing to hire him because of his sexual orientation.  He directly challenged the constitutionality of RCW 49.60.040(11), WLAD's religious nonprofit exemption, arguing it violates our state privileges and immunities clause, article I, section 12.  SUGM stipulated it would be facing a prima facie case of sexual orientation discrimination if it were a secular employer.  But because SUGM is a religious nonprofit exempt from WLAD under RCW 49.60.040(11), it moved for summary judgment on the ground that it is not an employer subject to WLAD liability.

The superior court issued a letter ruling and order granting SUGM's motion for summary judgment.  It found that SUGM qualifies as a religious nonprofit employer and that the staff attorneys' job duties extend beyond providing legal counsel, to include providing spiritual guidance.  The court ruled it would be impermissible to "determine . . . the relative merits of different religious beliefs."  CP at 171.  It concluded a trial would improperly focus on which activities within

---

an employee to urge a recovering addict to surrender his or her life to God when the employee publicly rejects well-known Christian teaching."  CP at 65.

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

SUGM are secular and which are religious, observing "societal tensions between religion and LGBTQ disputes 'must be resolved with tolerance [and] without undue disrespect to sincere religious beliefs.'" *Id.* (alteration in original) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, ___ U.S. ___, 138 S. Ct. 1719, 1732, 201 L. Ed. 2d 35 (2018)). As a result, the superior court dismissed Woods's claims with prejudice. The court did not address the ministerial exception or any constitutional defenses to WLAD liability raised by SUGM.

We granted direct review.

ANALYSIS

The majority frames the issue in this case as whether RCW 49.60.040(11)'s religious nonprofit exemption can be constitutionally applied under the ministerial exception, but this approach evades the constitutional question actually before us. Woods contends the exemption violates article I, section 12 of the Washington State Constitution on both legislative favoritism grounds and equal protection grounds. Our state privileges and immunities clause requires that we consider the statutory exemption as it exists—not as we might rewrite it. Moreover, whether SUGM could successfully assert a constitutional *affirmative defense* to WLAD liability for acts of discrimination involving its ministers does not answer whether the (much broader) religious nonprofit exemption violates article I, section 12. Addressing the

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

constitutionality of the exemption as it was actually applied here, I would hold exempting SUGM from WLAD liability based on its status as a religious nonprofit violates article I, section 12 antifavoritism principles. I would also reject SUGM's asserted defenses under the First Amendment to the United States Constitution except insofar as it can prove the ministerial exception applies to Woods's employment.

A. The Religious Nonprofit Exemption Violates Article I, Section 12 Antifavoritism Principles

Article I, section 12 provides, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

In years past, we interpreted article I, section 12 like the federal equal protection clause. *Schroeder v. Weighall*, 179 Wn.2d 566, 571, 316 P.3d 482 (2014). But over time "[o]ur cases . . . recognized that the text and aims of article I, section 12 differ from that of the federal equal protection clause." *Ockletree v. Franciscan Health Sys.*, 179 Wn.2d 769, 775-76, 317 P.3d 1009 (2014) (lead opinion). Congress passed the Fourteenth Amendment after the Civil War in part to prevent states from denying any person equal protection under the law. *See State v. Smith*, 117 Wn.2d 263, 283, 814 P.2d 652 (1991) (Utter, J., concurring). The framers of our privileges

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

and immunities clause, in contrast, "intended to prevent people from seeking certain privileges or benefits to the disadvantage of others." *Id*. The clause aims to prevent "favoritism and special treatment for a few." *Id*. For this reason, we now apply an independent analysis from the federal equal protection clause in cases involving legislative favoritism. *E.g.*, *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 359, 340 P.3d 849 (2015) (citing *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 805, 811, 83 P.3d 419 (2004)). Still, this independent, antifavoritism analytical framework "did not overrule our long line of article I, section 12 cases addressing laws that burden vulnerable groups" on state equal protection grounds. *Schroeder*, 179 Wn.2d at 577.

Under the antifavoritism framework, the terms "privileges" and "immunities" "pertain alone to those fundamental rights which belong to the citizens of the state by reason of such citizenship." *State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902). The threshold question in our antifavoritism analysis is whether the challenged statute implicates or encroaches on a fundamental right of state citizenship. *Schroeder*, 179 Wn.2d at 572.[3]

---

[3] If a statutory benefit does not first encroach on a fundamental right of state citizenship, this constitutional inquiry ends. *See, e.g.*, *Grant*, 150 Wn.2d at 814; *Ventenbergs v. City of Seattle*, 163 Wn.2d 92, 102-05, 178 P.3d 960 (2008) (determining that while the constitutional inquiry under article I, section 12 must end because the right at issue there was not a fundamental right, courts would still analyze the disputed law under

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)


As for the threshold question, the majority holds the fundamental rights implicated here are the right to an individual's sexual orientation and the right to marry. Majority at 9. But it locates these rights exclusively in federal due process cases that erroneously tie (and thereby limit) principles of antidiscrimination recognized as fundamental in Washington.[4] Majority at 9-11 (citing *Lawrence v. Texas*, 539 U.S. 558, 577-78, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003); *Bowers v. Hardwick*, 478 U.S. 186, 215-20, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986) (Stevens, J., dissenting); *Obergefell v. Hodges*, 576 U.S. 644, 663-65, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015)). Whether a statute violates due process is distinct from whether

---

a general rubric of reasonableness because the legislature must exercise its police power in a reasonable way).

[4] To be clear, I would welcome the recognition of marriage and the right to live free from discrimination based on sexual orientation as fundamental rights of state citizenship. But that is not what today's majority does. The majority recognizes those rights as fundamental rights under federal constitutional principles and subtly distances fundamental rights of state citizenship, concluding only that there may be "the right to one's sexual orientation as manifested as a decision to marry." Majority at 13. Importantly, the majority does not address *Andersen v. King County*, 158 Wn.2d 1, 30-31, 138 P.3d 963 (2006) (plurality opinion) (rejecting marriage equality as a fundamental right), *overruled by Obergefell v. Hodges,* 576 U.S. 644, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015). The result is a "fundamental right to marry" and a "fundamental right to sexual orientation" under the due process clause of the federal constitution, but if the majority intends to protect these rights under our state constitution, it should explicitly hold they are fundamental to state citizenship.

-10-

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

a statute grants a privilege or immunity. The majority's analysis is plainly built on the wrong constitutional foundation.[5]

Worse, after positing fundamental due process rights to open the door to a privileges and immunities analysis, the majority promptly abandons them and minimizes the import of WLAD. I would hold WLAD implicates a right we have long recognized as a fundamental right of state citizenship—the civil right to seek redress for discrimination. *Ockletree*, 179 Wn.2d at 794-97 (Stephens, J., dissenting) (recognizing that protection from discrimination is a "personal," civil right redressable at common law), *see id*. at 806 (Wiggins, J., concurring in part in dissent) ("I agree with the dissent that the exemption of religious and sectarian organizations in RCW 49.60.040(11) is subject to scrutiny under the privileges and immunities clause of article I, section 12 of the Washington Constitution."); *see also*

---

[5] We have never equated fundamental rights guaranteed by the federal due process clause with the fundamental rights of state citizenship protected under article I, section 12. Those two categories of fundamental rights are distinct—they protect different rights for different reasons. It would be anachronistic for the framers of Washington's constitution in 1889 to have intended to safeguard rights that would not be protected under federal due process for a generation. *See Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). Moreover, fundamental rights of state citizenship are not necessarily fundamental federal constitutional rights. *See Ockletree*, 179 Wn.2d at 793 (Stephens, J., dissenting) (collecting cases and noting we have applied a standard less stringent than strict scrutiny to cases involving the fundamental right to sell cigars, animal feed, and eggs).

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

*Cotten v. Wilson*, 27 Wn.2d 314, 317-20, 178 P.2d 287 (1947) (holding the right to sue in negligence is a privilege of state citizenship protected by article I, section 12). We should recognize Woods enjoys a fundamental right of state citizenship to seek redress for employment discrimination and proceed under our two part privileges and immunities analysis. *Schroeder*, 179 Wn.2d at 572-73. "First, we ask whether a challenged law grants a 'privilege' or 'immunity' for purposes of our state constitution." *Id*. at 573 (quoting *Grant*, 150 Wn.2d at 812). "If the answer is yes, then we ask whether there is a 'reasonable ground' for granting that privilege or immunity." *Id*. (quoting *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 145 Wn.2d 702, 731, 42 P.3d 394 (2002)).

As to the first question, we must consider the religious nonprofit exemption as it was written and how it was actually applied in this case. The exemption categorically exempts religious nonprofits from WLAD, thereby creating a status-based privilege to discriminate in employment (or stated differently, an immunity from WLAD liability for employment discrimination). It operates solely on the basis of the employer's status as a religious nonprofit. *Ockletree*, 179 Wn.2d at 797 (Stephens, J., dissenting), 806 (Wiggins, J., concurring in part in dissent); *cf. Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 672-81, 807 P.2d 830 (1991) (holding that RCW 49.60.040 categorically exempts religious nonprofits, including subsidiaries

-12-

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

of larger religious nonprofit entities, no matter if the subsidiary itself has an independent religious purpose). Because the exemption grants religious nonprofits a privilege or immunity within the meaning of article I, section 12, we next consider whether reasonable grounds exist for granting such a privilege.

The majority offers several justifications for a WLAD exemption that respects employers' religious freedoms. It describes the religious employer exemption as balancing the "*statutory* right for employees to be free from discrimination" against religious employers' "*constitutional* right . . . to choose workers who reflect the employers' beliefs when hiring ministers."[6] Majority at 2. But, this description is both counter-factual and inconsistent with the majority's own fundamental rights analysis.

Contrary to the majority's description, the religious employer exemption reflects no balancing of interests based on an employer's exercise of religious

---

[6] Today's majority repeats the rejected view of the lead opinion in *Ockletree*, which had insisted that "protection from discrimination in private employment is a creature of statutory enactment." 179 Wn.2d at 780. However, both the concurrence and dissent in *Ockletree* held that the statutory exemption implicates a fundamental right and is thus subject to scrutiny for reasonable grounds under article I, section 12. *Id*. at 806 (Wiggins, J., concurring in part in dissent), 794-97 (Stephens, J., dissenting). Indeed, given WLAD's recognition of the "civil right" to "obtain and hold employment without discrimination," RCW 49.60.030(1)(a), the dissent in *Ockletree* observed, "It is simply incredible for the lead opinion to suggest that Washington citizens enjoyed no state common-law remedy for discrimination until 1973—and that even today they must rely on state and federal legislative grace to vindicate their rights." 179 Wn.2d at 796.

-13-

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

freedoms. It applies only to religious nonprofits and, as observed in *Farnam*, it applies to all activities of such nonprofits regardless of whether they are religious activities. 116 Wn.2d at 676-77. Thus, a secular employer exercising protected religious rights cannot claim the exemption, while a religious nonprofit enjoys the legislatively granted immunity carte blanche. The majority, under the guise of an as-applied challenge, imagines an exemption that does not exist—and that was not applied here. It is undisputed that SUGM claimed, and was granted, the exemption based on its status as a religious nonprofit, period.

Moreover, the majority's characterization of Woods's right to be free from discrimination as merely a statutory right contradicts its conclusion under the first part of its privileges and immunities analysis. There, the majority concluded Woods's claim implicates the fundamental constitutional rights to marriage and sexual orientation. Majority at 9. While I disagree with the majority's grounding of the relevant rights in the federal due process clause, it is true that Woods has a fundamental right to be free from discrimination based on sexual orientation. Under the majority's own framework, it is Woods's *constitutional rights* that we must balance against the religious employers' *statutory privilege*, not the other way around. The majority's failure to properly weigh the rights at issue in this case

-14-

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

undermines its subsequent determination that reasonable grounds support the religious employer exemption.

"The article I, section 12 reasonable grounds test is more exacting than rational basis review. Under the reasonable grounds test a court will not hypothesize facts to justify a legislative distinction." *Schroeder*, 179 Wn.2d at 574. Instead, we "scrutinize the legislative distinction to determine whether it *in fact* serves the legislature's stated goal." *Id*. The distinction must depend on "real and substantial differences bearing a natural, reasonable, and just relation to the subject matter of the act." *State ex rel. Bacich v. Huse*, 187 Wash. 75, 84, 59 P.2d 1101 (1936), *overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 603 P.2d 819 (1979). Put differently, "[t]he distinctions giving rise to the classification must be germane to the purposes contemplated by the particular law." *Id*. We "do not extend the legislature permission to 'proceed incrementally,' instead [we] tak[e] a statute as [we] find it." *Ockletree*, 179 Wn.2d at 797 (Stephens, J., dissenting) (quoting Jonathan Thompson, *The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection" Review of Regulatory Legislation?,* 69 TEMPLE L. REV. 1247, 1278-79 (1996)).

RCW 49.60.010 states the legislature's goal or purpose:

> This chapter shall be known as the "law against discrimination." It is an
> exercise of the police power of the state for the protection of the public

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

> welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights. The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, citizenship or immigration status, families with children, sex, marital status, sexual orientation, age, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.

In the context at issue, WLAD's stated goal is quite simply the "elimination and prevention of discrimination in employment." *Id*.

While legislatures sometimes include blanket exemptions for religious organizations in various statutes, and such exemptions may reflect legislative attempts to safeguard free exercise rights, *see State v. Arlene's Flowers, Inc.*, 193 Wn.2d 469, 520, 441 P.3d 1203 (2019), there is no evidence of that here. Contrary to the majority's characterization, WLAD's stated goal or purpose does not encompass safeguarding the free exercise of religion (or avoiding excessive entanglement with religion). *See generally* RCW 49.60.010. And we are not free to infer or "hypothesize" such a goal simply because the exemption exists. *See Schroeder*, 179 Wn.2d at 574 ("Under the reasonable ground test a court will not hypothesize facts to justify a legislative distinction."). Doing so risks the reasonable

-16-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

grounds standard—a heightened standard of review—devolving into rational basis review.

Indeed, the majority's reasoning appears to be circular by gleaning the legislature's goal or purpose from the legislative distinction itself. *See* majority at 11 (noting that "RCW 49.60.040(11) itself is evidence of reasonable grounds"). But we do not analyze reasonable grounds as a syllogism (i.e., legislative distinctions encompass legislative goals; the religious nonprofit exemption here is a legislative distinction; thus, the religious nonprofit exemption encompasses a legislative goal). The reasonable grounds test would be a pointless exercise if that were the case, a tautology. Instead, we look at the broader goal or purpose of the statutory scheme. *State ex rel. Bacich*, 187 Wash. at 84 (determining the distinction must bear a true "relation to *the subject matter of the act*" (emphasis added)). Here, the law against discrimination's goal or purpose is just that: antidiscrimination. *See generally* RCW 49.60.010. The question thus becomes whether exempting religious nonprofits *in fact* serves the legislature's *antidiscrimination* goal. It does not. The legislative distinction here is antithetical to WLAD's stated goal or purpose because it gives religious nonprofits carte blanche to discriminate in employment.

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

Despite bearing no relationship to WLAD's purpose, the majority argues *Ockletree* held the religious nonprofit exemption rests on reasonable grounds. Majority at 13. I disagree.

The *Ockletree* court could not agree on a common line of reasoning establishing reasonable grounds for the exemption so it establishes no precedent on that point of law. The lead opinion and Justice Wiggins agreed reasonable grounds existed but neither accepted the other's reasoning. *See Ockletree,* 179 Wn. 2d. at 783-86 (lead opinion), 806 (Wiggins, J., concurring in part in dissent). The dissent determined, on the other hand, no reasonable grounds existed. *Id*. at 797-800 (Stephens, J., dissenting).

Accordingly, *Ockletree* did not hold WLAD's stated goal or purpose encompasses fostering free exercise or avoiding entanglement with religion. Whether reasonable grounds ultimately justify the religious nonprofit employer exemption remains an open question.

To answer this question, we must focus on the exemption as it actually exists and was applied in this case. The majority errs by instead aligning the statutory exemption with the ministerial exception developed under First Amendment doctrine. *See* majority at 13 ("To determine whether reasonable grounds exist . . . in this case, we look to the ministerial exception outlined by the United States

-18-

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

Supreme Court."). But the United States Supreme Court's jurisprudence recognizing a limited constitutional privilege to discriminate has no bearing on whether the Washington legislature articulated reasonable grounds for granting religious employers a categorical privilege in RCW 49.60.040(11). This is particularly true given that the Supreme Court did not recognize the ministerial exception until 2012, fully 63 years after our legislature created WLAD's religious employer exemption. *See Hosanna-Tabor*, 565 U.S at 188-89 (first recognizing the ministerial exception); LAWS OF 1949, ch. 183, § 3(b) (exempting religious nonprofits from the definition of employer).[7]

Taking the religious employer exemption as we find it—a requirement for reasonable grounds review under article I, section 12—I would hold the categorical exemption of religious nonprofits from WLAD's definition of employer grants an unconstitutional privilege to a favored class of employers. By its plain terms, the exemption categorically carves out religious nonprofits from WLAD, no matter if their activities have any religious purpose. RCW 49.60.040(11); *Farnam*, 116

---

[7] To be fair, lower federal courts had recognized the ministerial exception well before the United States Supreme Court. *See McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972). But even this earliest articulation of the ministerial exception came 23 years *after* the Washington legislature exempted religious nonprofits from WLAD. The Washington State legislature could not have relied on this theory of federal constitutional law to provide reasonable grounds for its decision to exempt religious nonprofits from WLAD in 1949.

-19-

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

Wn.2d at 672-81 (holding that the legislature categorically exempted all religious nonprofits entities from liability under WLAD, including subsidiaries not engaged in religious activities). Even if we were to impermissibly hypothesize that the exemption expresses a legislative intent to foster free exercise, it favors the free exercise rights of religious nonprofits over *all* other employers who might also hold sincere religious beliefs. That act of legislative favoritism unconstitutionally violates our state privileges and immunities clause because it does not rest on reasonable grounds—it does not serve WLAD's stated goals. *See, e.g.*, *Schroeder*, 179 Wn.2d at 574.[8]

Recognizing that the religious nonprofit exemption violates article I, section 12 does not mean employers like SUGM stand defenseless to assert religious freedoms against allegations of discrimination under WLAD. The First

---

[8] The majority fundamentally misunderstands the reasonable grounds analysis under article I, section 12 when it suggests we should not reach the question of facial invalidity as to the religious nonprofit exemption. *See* majority at 7-8. We are not at liberty to rewrite RCW 49.60.040(11), and that exemption categorically removes religious nonprofits from the definition of "employer" based solely on their status. Even framing the question as whether any circumstances exist under which the exemption can stand, it must fail because religious nonprofit status is not reasonable grounds for discrimination. The majority would collapse into its reasonable grounds analysis the separate—and as yet unaddressed—defense that SUGM may raise to application of WLAD based on the ministerial exception recognized under the First Amendment and article I, section 11. We cannot assume the existence of SUGM's unproven as-applied challenge to WLAD liability in order to rewrite the statute and then put the burden to Woods to challenge it. I would hold the categorical exemption that is actually before us is unconstitutional.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Amendment's ministerial exception may still serve as a constitutional defense to suits brought under antidiscrimination laws. But it must remain just that—a constitutional defense. We should refuse to rewrite an unconstitutional statute. *See City of Redmond v. Moore*, 151 Wn.2d 664, 668-69, 91 P.3d 875 (2004). By erroneously applying *Hosanna-Tabor* in the context of article I, section 12, my colleagues risk endorsing government entanglement with religion, not to mention prematurely reaching constitutional claims that are not before us. SUGM does not advance any specific argument on direct review claiming that the ministerial exception applies and it does not explicitly argue its lawyers are ministers under *Hosanna-Tabor*. SUGM correctly recognizes, "[I]n *Hosanna-Tabor*, it was the *employer* who put the job role at issue as a constitutional, affirmative defense to a generally applicable law." Br. of Resp't at 25. That is not the posture of the case before us. Doctrinally speaking, courts consider *Hosanna-Tabor*'s reasoning when raised as a constitutional *defense* to WLAD under the First Amendment—not to construct reasonable grounds for the exemption under article I, section 12. Since SUGM asserted the ministerial exception as an affirmative defense in its answer, CP at 16, I would remand for further proceedings and allow the parties to brief and argue about the applicability of that defense in the superior court. *See, e.g.*, *Erdman v. Chapel Hill Presbyterian Church*, 175 Wn.2d 659, 665-66, 286 P.3d 357 (2012)

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

(plurality opinion) (remanding Title VII of the Civil Rights Act of 1964 claim for further proceedings to establish whether the ministerial exception applies).

A remaining question is whether SUGM should also be able to pursue other defenses grounded in claims of religious freedoms. Specifically, SUGM broadly asserts application of WLAD to its employment decisions would violate its free exercise rights under the First Amendment and article I, section 11 of the Washington State Constitution. As discussed next, this assertion is inconsistent with established law interpreting these constitutional provisions. WLAD liability generally applies to religious nonprofits for discriminatory employment practices except in the narrow context of ministerial employment.

B. WLAD—A Neutral Law of General Applicability—Does Not Violate SUGM's Right to Free Exercise under the First Amendment Absent a Showing the Ministerial Exception Applies

SUGM argues that allowing it to be held liable under WLAD by invalidating the religious nonprofit exemption violates its free exercise rights under the First Amendment. But WLAD is a neutral law of general applicability that survives constitutional scrutiny. Courts may apply WLAD to a religious employers' alleged employment discrimination except in the narrow context of ministerial employment.

"The First Amendment provides, in part, that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'"

-22-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, ___ U.S. ___, 137 S. Ct. 2012, 2019, 198 L. Ed. 2d 551 (2017). The free exercise clause applies to the states through the Fourteenth Amendment. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 1213 (1940)). But "[n]ot all burdens on religion are unconstitutional," and "[t]he state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *United States v. Lee*, 455 U.S. 252, 257-58, 102 S. Ct. 1051, 1055, 71 L. Ed. 2d 127 (1982).

We apply two levels of scrutiny to laws that allegedly burden religion under the free exercise clause. *Arlene's Flowers*, 193 Wn.2d at 519. We apply rational basis review to neutral laws of general applicability. *Id*. And we apply strict scrutiny to "laws that discriminate against some or all religions (or regulate conduct *because* it is undertaken for religious reasons)." *Id*.

"A law is not neutral for purposes of a First Amendment free exercise challenge if 'the object of [the] law is to infringe upon or restrict practices *because* of their religious motivation.'" *Id*. (alteration in original) (quoting *Lukumi Babalu Aye*, 508 U.S. at 533). The object of WLAD in the context at issue here is the "elimination and prevention of discrimination in employment." RCW 49.60.010.

-23-

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

The legislature did not intend WLAD to infringe on or restrict employment decisions *because* of their religious motivation. SUGM has not shown, for example, that the legislature enacted WLAD to burden religious employers' employment practices or to specifically target them based on their creeds. I would hold WLAD is neutral under First Amendment free exercise doctrine. The next question is whether WLAD is a law of general applicability.

A law generally applies if it does not selectively "impose burdens only on conduct motivated by religious belief." *Lukumi Babalu Aye*, 508 U.S. at 543. As currently drafted, WLAD generally applies to all employers *except* "any religious or sectarian organization not organized for private profit." RCW 49.60.040(11). WLAD does not seek to selectively burden religiously motivated conduct. Holding the religious nonprofit exemption unconstitutional under our state privileges and immunities clause does not change the general applicability of the statute. Without the unconstitutional exemption, WLAD applies to all employers *except* religious employers that raise and prove an affirmative defense based on the ministerial exception. I would therefore construe WLAD as a law of general applicability.

Because I would construe WLAD as a neutral law of general applicability, I would apply rational basis review. *See Arlene's Flowers*, 193 Wn.2d at 519, 523 ("WLAD is a neutral, generally applicable law subject to rational basis review.").

-24-

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

WLAD easily meets that standard because it is rationally related to the government's legitimate interest in the "elimination and prevention of discrimination in employment." RCW 49.60.010.

That said, "the Religion Clauses ensure[] that the [government has] . . . no role in filling ecclesiastical offices." *Hosanna-Tabor*, 565 U.S. at 184. "Both Religion Clauses bar the government from interfering with the decision of a religious group" on the employment of its "ministers." *Id*. at 181. Because "there is a ministerial exception grounded in the Religion Clauses of the First Amendment," *id*. at 190, WLAD cannot constitutionally apply in the context of ministerial or ecclesiastical employment. "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

Application of WLAD to SUGM's discriminatory employment practices does not violate SUGM's free exercise rights under the First Amendment with reference to nonministerial positions. But that holding does not preclude SUGM or any religious employer from arguing a constitutional affirmative defense under the First Amendment's religion clauses based on the ministerial exception. *See generally id*.;

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

*Hosanna-Tabor*, 565 U.S. 171.  Whether SUGM's lawyers are ministers is not before us on review and remains to be addressed on remand.  I next turn to SUGM's state constitutional claim that article I, section 11 shields SUGM from liability under the statute—it does not.

> C. WLAD Does Not Violate SUGM's Right to "Absolute Freedom of Conscience in All Matters of Religious Sentiment, Belief and Worship" under Article I, Section 11 except in the Narrow Context of Ministerial Employment

Besides asserting its First Amendment rights, SUGM argues holding it liable under WLAD would violate article I, section 11 of the Washington State Constitution.

Article I, section 11 provides, in part, "Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion."  "[W]e have specifically held [in some contexts] . . . that article I, section 11 is more protective of religious free exercise than the First Amendment is."  *Arlene's Flowers*, 193 Wn.2d at 527 ("'[O]ur state constitutional and common law history support a broader reading of article [I], section 11, than of the First Amendment.'" (second alteration in original) (quoting *First Covenant Church of Seattle v. City of Seattle*, 120 Wn.2d 203, 224, 840 P.2d 174 (1992))).  SUGM did

-26-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

not provide an independent state constitutional analysis, and neither party addresses what level of scrutiny should apply under article I, section 11. But even assuming without deciding strict scrutiny applies, SUGM's article I, section 11 argument fails.

Generally, "we have applied the same four-pronged analysis in an article I, section 11 challenge: where a party has (1) a sincere religious belief and (2) the exercise of that belief is substantially burdened by the challenged law, the law is enforceable against that party only if it (3) serves a compelling government interest and (4) is the least restrictive means of achieving that interest." *Id.* (citing *City of Woodinville v. Northshore United Church of Christ*, 166 Wn.2d 633, 642, 211 P.3d 406 (2009)).

I do not question whether SUGM based its employment decision on a sincere religious belief that "'[a]ll staff members are expected to live by a Biblical moral code that excludes . . . homosexual behavior,'" CP at 4 (alteration in original) (quoting SUGM's Employee Code of Conduct), and I assume WLAD substantially burdens the exercise of that belief by preventing employment discrimination based on sexual orientation. *See* RCW 49.60.030(1)(a). So the question becomes whether WLAD serves a compelling governmental interest and is the least restrictive way to achieve that interest. *Arlene's Flowers*, 193 Wn.2d at 527.

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

In the context of racial discrimination in employment, the United States Supreme Court has held, "The Government has a compelling interest in providing an equal opportunity to participate in the work force without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014). The same result applies here. Preventing employment discrimination based on sexual orientation is a compelling governmental interest just like preventing employment discrimination based on race is. *See, e.g.*, *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 777 (8th Cir. 2019) ("If eradicating discrimination based on race or sex is a compelling state interest, then so is Minnesota's interest in eradicating discrimination based on sexual orientation.").[9] Discrimination against protected classes "menaces the institutions and foundation of a free democratic state." RCW 49.60.010. WLAD serves a compelling

---

[9] Jurists across the country have reached similar conclusions. *See, e.g.*, *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 32 (D.C. 1987) (concluding that the eradication of sexual orientation discrimination is a compelling governmental interest of the highest order that may override legitimate claims to free exercise of religion); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 355 (7th Cir. 2017) (Posner, J., concurring) (recognizing "[t]he compelling social interest" against discrimination based on sexual orientation under Title VII "as a sensible deviation from the literal or original meaning of the statutory language").

-28-

*Woods v. Seattle's Union Gospel Mission*, 96132-8
(Stephens, J., dissenting in part and concurring in part)

governmental interest—it safeguards the right of protected classes to obtain and hold employment without discrimination. *See* RCW 49.60.030(1)(a).

Although "[t]he least-restrictive-means standard is exceptionally demanding," *Hobby Lobby*, 573 U.S. at 728, there is no less restrictive means available here to satisfy the government's compelling interest in eliminating and preventing employment discrimination based on sexual orientation. Our recent decision in *Arlene's Flowers* reveals this truth. There, a flower shop owner discriminated based on sexual orientation by refusing to provide custom floral arrangements for a same-sex wedding. 193 Wn.2d at 483-84. We concluded "public accommodations laws do not simply guarantee access to goods or services. Instead, they serve a broader societal purpose: eradicating barriers to the equal treatment of all citizens in the commercial marketplace. Were we to carve out a patchwork of exceptions for ostensibly justified discrimination, that purpose would be fatally undermined." *Id*. at 531 (footnote omitted). We unanimously held WLAD survives strict scrutiny in an article I, section 11 challenge. *Id*. at 528-32.

The reasoning in *Arlene's Flowers* applies equally here because employment and public accommodation antidiscrimination laws serve the same purpose— "eradicating barriers to the equal treatment of all citizens." *See id*. at 531. Providing ad hoc exemptions for sincere religious beliefs would frustrate WLAD's goal of

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"elimination and prevention of discrimination in employment." RCW 49.60.010;
*see Masterpiece Cakeshop*, 138 S. Ct. at 1727 (noting that if the Court did not
confine the refusal to provide goods and services to ministers who object to LGBTQ
lifestyles on moral and religious grounds, "then a long list of persons who provide
goods and services . . . might refuse to do so for gay persons, thus resulting in a
community-wide stigma inconsistent with the history and dynamics of civil rights
laws that ensure equal access to goods, services, and public accommodations").
Allowing religious employers to discriminate against LGBTQ persons outside the
context of ministerial employment would likewise lead to "a community-wide
stigma" that WLAD aims to eliminate. *See Masterpiece Cakeshop*, 138 S. Ct. at
1727.

More to the point, like the court in *Arlene's Flowers*, I cannot locate "any case
invalidating an antidiscrimination law under a free exercise strict scrutiny analysis."
*See* 193 Wn.2d at 530-31 (collecting cases in which antidiscrimination laws have
survived strict scrutiny). I would therefore hold that SUGM's broadly asserted
defense under article I, section 11 fails, even assuming strict scrutiny applies. *See
id.* at 528-32. On remand, SUGM may seek to establish a narrow affirmative defense
based on the ministerial exception, but that defense is not part of our article I, section
12 analysis and is not before us on review.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

CONCLUSION

RCW 49.60.040(11)'s exemption of religious nonprofits from WLAD's definition of employer violates our state privileges and immunities clause on antifavoritism grounds. Applying reasonable grounds review, I would invalidate the categorical exemption as it was actually applied here—to categorically exempt SUGM from Woods's claims of employment discrimination. While I believe this is the correct holding under article I, section 12, such a holding does not deny employers like SUGM religious freedoms. Though broadly asserted claims of free exercise fail, the narrow ministerial exception may be asserted as a defense to WLAD liability. I would remand to the superior court so that SUGM may seek to prove that applying WLAD to its decision not to hire Woods violates its right under the federal and state religion clauses based on the ministerial exception. Accordingly, while I dissent from the majority's analysis and conclusion under article I, section 12, I concur in the result.

Stephens, J.

Fairhurst, J.P.T.

-31-